Samuel Richard Rubin
FEDERAL PUBLIC DEFENDER
Miles Pope
Assistant Federal Defender
FEDERAL DEFENDER SERVICES OF IDAHO
702 West Idaho Street, Suite 1000
Boise, Idaho 83702
Telephone:   (208) 331-5500
Facsimile:   (208) 331-5525

Attorneys for
SERGIO MIRAMONTES-MALDONADO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
(HONORABLE B. LYNN WINMILL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR19-060-S-BLW |
| | ) | |
| Plaintiff, | ) | **Sentencing Memorandum** |
| | ) | |
| vs. | ) | |
| | ) | |
| SERGIO MIRAMONTES-MALDONADO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The Court should take the following actions at Sergio Miramontes-Maldonado's sentencing hearing:

- Impose a sentence of 1 day to serve;

- Set a self-surrender date for no earlier than one month after Mr. Miramontes is able to get an FDA-approved Covid-19 vaccine; and

- Include in the judgment a recommendation that the Executive Branch waive removal and permit Mr. Miramontes to remain in the United States with his family.

Here's why.

Sentencing Memorandum          -1-

**I**

Sergio Miramontes-Maldonado is an undocumented American who first entered the United States in 1990, when he was 16 or 17 years old. He came to the U.S. to send money back to his family in Mexico and to remain in partnership with the woman who has now been his wife for the past quarter of century, whom he met in Mexico and has been with since he was 14 years old.

Mr. Miramontes is an astonishing American success story. Within 3 days of arriving in Klamath Falls, Oregon, he found work as a farm laborer. Shortly after that, wanting to transition to the restaurant industry, Mr. Miramontes took on two jobs: by day he would work in the fields, and in the evening he would work in restaurants. Within ten months of starting in the restaurant industry, Mr. Miramontes was promoted to manager – a position he has held at various restaurants virtually ever since.

Over the years, Mr. Miramontes has also been an entrepreneur – taking the risk of opening two restaurants. Both failed, but Mr. Miramontes did not. When the Department of Homeland Security arrested Mr. Miramontes, on February 7, 2019, he had been managing the Costa Vida restaurant since 2009. When ICE arrested him, he was on his way to work.

The Miramontes family has deep roots in Idaho. When Mr. Miramontes and his wife first came to the United States, they began their life in Klamath Falls, Oregon. Their first child, Gemma Miramontes, was born in Oregon on November 12, 1990. Gemma was followed by a son, Mauro, born on March 31, 1993; Grecia, born on November 12, 1997; and Sara Michelle, born, in Idaho, in 2003. In 2001 or 2002, Mr.

Miramontes moved from Oregon to Idaho for work. The family has lived in Idaho ever since.

The success of Mr. and Mrs. Miramontes's children is a testament to Mr. Miramontes and his wife's own character and drive. With Mr. and Mrs. Miramontes as their teachers, the Miramontes children have learned that they need to work hard, earn a living, and give back to their community. His children are hard-working Americans – one daughter works as a collections specialist at CitiBank, another as a home-care branch manager, and his youngest just recently got her first job too. Their letters are earnest, articulate, and speak to the values with which they were raised.

The letters. This Court has before it over 30 letters of support that attest to Mr. Miramontes's commitment to his family and community. Former colleagues write that Mr. Miramontes is "trustworthy with the company money," "honest and kind," "comes early and stays till the work is done," and is "a contributor to society not a taker." "I have suffered without him this last year. My restaurant hasn't been the same without his happy and easy friendly countenance."

His family's longtime physician – echoing numerous others – describes him as a "strong pillar of support" for his family. Community members think the world of him:

> My name is Donald Cockrell, I am 90 years of age. I served 21 years in the Navy and 17 years with KMart.
>
> I have known Sergio Miramontes and his family for nearly 25 years. In that time I have found him to be reliable as a close friend. Anytime I have asked for his help he has provided it.

Sentencing Memorandum                    -3-

This is clearly an extraordinary man. "In 2015 my dad had an accident, in which we lost everything," writes Katie. "And mister Miramontes was always on the look for what we needed. Like food, money, transportation, but most importantly emotional support."  "He was always there for me and is like a second father to me," writes Marisela Figueroa. "When I met [Sergio]," writes Isaiah Cruz (no relation), "I was young and naïve. I have my own parents but there was a father figure that stood out to me that I always looked up into and he has always been a true role model for me." Rut Cardenas, his youngest daughter's best friend, writes "He's . . . a very caring person. . . . He's always cared for me as if I was his own daughter."  Daniel Sandoval, Mr. Miramontes's son-in-law, says this about him:

> He is an outstanding father and grandpa to his grandkids. I became a father at a very young age . . . and without doubt he was here to guide me and support me while I was still trying to figure out my own life. . . . Sergio Miramontes has taught me to be who I am today, we would talk for hours and he would talk about life goals and to always do the right thing no matter what. On many occasions when I did not have money Sergio Miramontes Maldonado has supported me my wife and our daughter at the time, he never complained or made me feel guilty for not being able to provide.

(For the record, that's four non-blood relations describing Mr. Miramontes as being like a father to them.)

Mr. Miramontes's grandchildren are learning, from him, the same important lessons of character, grit, and drive that he has taught his children.

My name is Daniela Lizbeth Sandoval and i have known  Sergio Miramontes since I was born
we have been really close i am his oldest in his grandaughter, i helped him do some hard
working around the house where we used to live and now we still do that .I know Sergio used to
work at Fiesta Guadalajara and was working at Costa Vida Restaurant for  years now. What
Sergio Miramontes means to me he means the world to me he is a loving guy everyone loves
him he taught me what is right or wrong he gave me examples where to work at when i am older
and taught me to always do the right thing no matter what to always be kind and a hard worker
so when i grow up i can have a good life my grandpa has always been there for us and all the
family and i cant imagine my life without him here with us we have always lived close and i want
to continue to be together my grandpa is an amazing man and always helping everyone he
knows please dont take my grandpa from our family please thank  you judge

In the words of yet another letter of support, he's an "awesome grandfather."

It is regrettable that Mr. Miramontes is on a track to be removed from a child who is still a minor and from grandchildren who adore him. Given the importance of a stable family structure to child development – and given how gifted Mr. Miramontes is at being a father – it is likely that whatever benefit will accrue to the United States from this prosecution and the subsequent removal is going to be outweighed by the trauma his (especially young) children and grandchildren will experience as they grow up without a father or grandfather.

## II

Sometimes we describe ourselves, with pride, as a nation of immigrants. When we do, a person like Mr. Miramontes is who we have in mind.

American values include hard work, family, faith, community, patriotism, and optimism – all leavened with good humor. Mr. Miramontes embodies these values. Starting with nothing, as a farm laborer, he worked his way into prosperity. He started – and then (the hard part) *raised* – a good family. He is devoted to his faith and a valued member of his community. He is a patriot, a taxpayer, and – though he

has since had to abandon this part of the American dream – was on his way to full homeownership at the time of his arrest.

And optimism and good humor are his watchwords. There is *always* a smile on Sergio Miramontes's face, *always* a (corny) joke on his lips. We've never had a meeting where his impish sense of humor hasn't shone through, exasperating his amused daughter and making his grandkid smile.

And it's not just with his family; it's *everywhere*. For the first month of my representation, Mr. Miramontes was detained at Jerome County Jail waiting for resolution of the government's appeal of Judge Dale's release order.[1] He was the life of his pod. There he was – a hard-working homeowner and family man who'd only been in jail once before (for 48 hours) when he was in his twenties – surrounded by the troubled population we control through the police, and instead of withdrawing or holding himself apart, he brought them hope and happiness.[2] It was, in a sense, a ministry. Talk about optimism.

When we are in the mood to describe ourselves as a nation of immigrants, we can easily say this too: America has been lucky to have Sergio Miramontes-Maldonado choose it as his home.

---

[1] *See* ECF Nos. 16, 25.

[2] Jails use stereo systems to announce chow time, pill time, lockdowns, and other phases of the day. Mr. Miramontes's ham-fisted imitation of those announcements was in high demand. And he kept this all up despite being under obvious stress, including losing approximately 20lbs while waiting for the pretrial release litigation to conclude.

### III[3]

Of course – especially when it comes to people who are not white – we're not always in such a friendly mood. When we're not, we often turn to 8 U.S.C. § 1326.

In 1929, Congress criminalized, for the first time, the general act of entering the United States following deportation – making it a felony punishable by up to 2 years in prison.[4] This general criminal immigration provision wasn't the first time Congress criminalized border-crossings. A 1910 law made it a misdemeanor for those who had been deported for involvement in prostitution to reenter the United States,[5] and, in 1918, Congress made it a felony to reenter the U.S. after having been deported as an "anarchist."[6] While it was not the first "crimmigration" statute, the 1929 predecessor to § 1326 does represent the first time Congress criminalized the mere act of returning to the U.S. following deportation – no matter the original underlying grounds for removal.

---

[3] I am indebted, in this section, to the tremendous historical legwork done by my colleague Nora K. Hirozawa in the Southern District of California's Federal Public Defender Office.

[4] *See* Act of March 4, 1929, Pub. L. No. 70-1018, ch. 690, § 1, 45 Stat. 1551 (codified at 8 U.S.C. § 180(a) (1929 sup. III)).

[5] Act of March 26, 1910, ch. 128, § 3, 36 Stat. 264, 264-65 (codified at 8 U.S.C. § 138 (1926).

[6] Act of October 16, 1918, Pub. L. No. 61-107, ch. 186, § 3, 40 Stat. 1012-13 (codified at 8 U.S.C. § 137(h) (1926)). If you thought the timing of this Act had something to do with the 1917 Bolshevik Revolution and the associated Red Scare, you would be correct. *See* Mary E. Fairhurst & Andrew T. Braff, *William O. Douglas: The Gadfly of Washington*, 40 Gonz. L. Rev. 259, 275 (2005) (noting that the 1917 Alien Act and 1918 Sedition Act were passed in response to the first Red Scare).

Enacted amidst the anti-immigration fervor of the mid-to-late-1920s, the crime of illegal reentry was birthed, passed, and is implemented to target and punish non-white immigration offenders.[7] First proposed in 1927, the law was the brainchild of two racist men – Secretary of Labor James Davis and South Carolina Senator Coleman Livingston Blease.[8] Secretary Davis, a devotee of eugenics, was animated by a belief in the necessity of distinguishing between, in his words, "bad stock and good stock, weak blood and strong blood, sound heredity and sickly human stuff."[9] In 1927, when he proposed the immigration reforms that eventually birthed illegal reentry in the pages of the New York Times, he stated that their goal was "the definite lessening and possibly, in time, the complete checking of the degenerate and the bearer of degenerates."[10]

This vision appealed to Secretary Davis's comrade-in-arms, South Carolina Senator Coleman Livingston Blease.[11] Senator Blease was a "proud and unreconstructed white supremacist," and he was fixated on using criminal laws to

---

[7] *See* Ian MacDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, PROPUBLICA, June 19, 2018, https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy (last accessed August 12, 2020); Kelly Lytle Hernandez, *How Crossing the US-Mexico Border Became a Crime*, THE CONVERSATION, April 30, 2017, https://theconversation.com/how-crossing-the-usmexico-border-became-a-crime-74604 (last accessed March 8, 2019); Libby Watson, *How Crossing the Border Became a Crime*, SPLINTER NEWS, June 29, 2018, https://splinternews.com/how-crossing-the-border-became-a-crime-1827160001.

[8] *See* MacDougall, *supra* n.7.

[9] *Id.*

[10] *Id.*

[11] *Id.*

accomplish apartheid and the creation of a white-supremacist state.[12] Two actions contemporaneous with his sponsorship of the crime of illegal reentry give a flavor for his overarching political program. In 1928, Senator Blease propose amending the U.S. Constitution to criminalize miscegenation and punish ministers who agreed to officiate at interracial weddings.[13] In 1929, to protest First Lady Lou Hoover's decision to invite an African-American woman to tea at the White House, he read the poem "Niggers in the White House" into the Congressional Record and sponsored a resolution urging the Hoovers to "remember that the house in which they are temporarily residing is the 'White House'."[14] When he was eventually persuaded to withdraw this resolution, he explained that he did so "because it gave offense to his friend, Senator Bingham, and not because it might give any offense to the Negro race."[15]

---

[12] *See* Kelly Lytle Hernandez, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965* (University of North Carolina Press 2017).

[13] *See* Isaac Stanley-Becker, *Who's behind the law making undocumented immigrants criminals? An 'unrepentant white supremacist.'*, The Washington Post (June 27, 2019), *available at* https://webcache.googleusercontent.com/search?q=cache:C6jFCCkeHucJ:https://www.washingtonpost.com/nation/2019/06/27/julian-castro-beto-orourke-section-immigration-illegal-coleman-livingstone-blease/+&cd=4&hl=en&ct=clnk&gl=us.

[14] *See* Providence Evening Tribune, p.7 (June 18, 1929), *available at* https://news.google.com/newspapers?nid=2211&dat=19290622&id=4mNGAAAAIBAJ&sjid=feUMAAAAIBAJ&pg=1235,7688059.

[15] The Baltimore Afro-American, p. 1 (June 22, 1929), *available at* https://news.google.com/newspapers?nid=2211&dat=19290622&id=4mNGAAAAIBAJ&sjid=feUMAAAAIBAJ&pg=1235,7688059.

The racially-charged anti-immigrant fervor of the mid-1920s proved a valuable political opportunity for Secretary Davis and Senator Blease to advance their white-supremacist immigration program. There was just one political problem that they had to navigate: While congressional nativists had managed to exclude several (from their perspective) undesirable racial groups from the U.S.,[16] "[m]igrants from Mexico were one group whose numbers the increasingly powerful nativist elements in Congress hadn't managed to restrict."[17] The reason for this, as Ian MacDougall explains, is that "Mexican workers were key to the booming economy of the southwest."[18] Because of this, "[r]egional employers, particularly in the agricultural sector, had successfully lobbied Congress to block any bill that would choke off their primary source of inexpensive labor" – i.e., Mexicans.[19]

Senator Blease saw Secretary Davis's proposal to criminalize illegal reentry as a savvy way to advance his white-supremacist agenda, "bridg[ing] the gap between the nativists clamoring for quotas and southwestern congressmen resisting them."[20] "Large-scale farmers didn't mind criminal penalties" for their undocumented workers

---

[16] *See, e.g.*, Quota Act of 1921, Pub. L. No. 67-5, ch. 8, § 2, 42 Stat. 5 (exempting the Western Hemisphere but otherwise limiting annual immigration to 3% of the number of the residents of that country living in the U.S. per the census of 1910 – with the practical effect of largely excluding non-Western Europeans); Immigration Act of 1924, Pub. L. No. 68-139, ch. 190, § 11, 43 Stat. 153, 159 (reducing that number to 2%).

[17] MacDougall, *supra* n.7.

[18] MacDougall, *supra* n.7

[19] MacDougall, *supra* n.7.

[20] MacDougall, *supra* n.7.

"so long as the law was enforced once the harvest was over."[21] Criminalizing illegal reentry was a perfect compromise: southwestern industry could still be assured a steady supply of cheap Mexican labor desperate for stability and a living wage, and all the while criminal immigration laws would help ensure that those workers remained marginalized and subordinated.

Of course, the *ostensible*, race-neutral, purpose of criminalizing reentry was – not to create a subordinate and marginalized population of cheap and expendable workers – but to deter illegal immigration.[22] One doesn't need to look very hard, however, to see the lie in that putative rationale.

***First***, if deterring illegal immigration is the goal, then Congress – in choosing to prosecute undocumented immigrants – chose a singularly ineffective means of accomplishing it. Deterrence requires knowledge of the deterrent. But "the knowledge hurdle is particularly acute in the context of prosecuting illegal entry and re-entry cases because the target audience is comprised of non-U.S. residents, many of whom neither have a familiarity with U.S. law nor speak English."[23]

***Second***, over time, immigration enforcement has *deliberately* been kept at a level sufficient to maintain a steady supply of cheap Mexican labor. As Kitty Calavita notes, immigration officials were under tremendous pressure from business leaders

---

[21] MacDougall, *supra* n.7.

[22] *See* Doug Keller, *Rethinking Illegal Entry and Re-Entry*, 44 Loyal U. Chicago L. Rev 65, 72 (2011) (noting that the ostensible "goal" of § 1326 was "deterring illegal immigration from Mexico").

[23] *Id.* at 76.

and politicians to ensure that their immigration enforcement programs did not stand in the way of cheap labor.[24] Congressional representatives constantly reminded the INS that rigid enforcement of the immigration laws was undesirable if it resulted in the "reduction of the farm labor supply."[25] Unsurprisingly, then, enforcement of the immigration laws tends to ramp up during periods when the labor market is slack and nativist sentiment is high. During the Depression Era an estimated 1 million Latinos were removed from the United States.[26] Then, again, in the wake of World War II and the Second Red Scare, the government launched "Operation Wetback," which resulted in the removal of about 3.7 million Latinos.[27] The correlation between immigration enforcement, nativist sentiment, and labor-market need undermines any notion that the immigration laws are aimed at deterring unauthorized border crossings.

*Third*, there is no starker evidence that deterring illegal immigration is not a true goal of criminal immigration laws than the structure of penalties and enforcement for those who *incentivize* illegal immigration – i.e., employers. For many reasons, employers are vastly more responsive to deterrence than are impoverished

---

[24] *See* Kitty Calavita, *Inside the State: The Bracero Program, Immigration, and the I.N.S.* 34-35 (1992).

[25] *Id.* at 29, 35-37.

[26] *See* Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* 7 (Princeton University Press 2004).

[27] *See* Stephen W. Bender, *Run for the Border: Vice and Virtue in U.S.-Mexico Border Crossings* 125 (NYU Press 2012).

and uneducated Mexican workers.[28] By far the most effective means of deterring illegal immigration, therefore, is to punish employers who hire illegal immigrants.

Yet we don't. 8 U.S.C. § 1324a is the statute that proscribes unlawful employment of aliens, and it is virtually impossible to be criminally prosecuted under this law. The penalty for an employer who violates § 1324a for the first time (no matter how many undocumented immigrants he or she employs) is a civil fine of between $583 and $4,667 per undocumented worker. *See* 8 C.F.R. § 274a(b)(ii)(A). The penalty for a second offense is a civil fine of between $4,667 and $11,665 per undocumented worker. *Id.* § 274a(b)(ii)(B). A third offense is *still* a civil matter, requiring payment of between $6,999 and $23,331 per undocumented worker. *Id.* § 274a(b)(ii)(C). Only after *multiple* violations of this law – what the law refers to as a "pattern or practice of violations" – can an employer be criminally prosecuted. *See* 8 U.S.C. § 1324a(a). The maximum penalties? Six months in jail and $3,000 per undocumented worker. *See* 8 C.F.R. § 274a(a).

There are also other barriers to effective enforcement of the law prohibiting unlawful employment of undocumented workers. Whereas undocumented immigrants are subject to steep, felony penalties for falsely claiming to have authorization to work, employers are *legally required* to turn a blind eye; they can do nothing *but* accept "reasonably genuine-looking" employment-verification

---

[28] *See generally* Paul H. Robinson & John M. Darley, *The Role of Deterrence in the Formulation of Criminal Law Rules: At Its Worst When Doing Its Best*, 91 Geo. L.J. 949, 954 (2003) ("We can expect greater deterrent possibilities when dealing with more rational [and educated] target audiences, such as white collar offenders.")

documents.[29] As long as they comply with this requirement "in good faith," they thereby present an "affirmative defense" to any § 1324a prosecution. 8 U.S.C. § 1324a(a)(3).

Unsurprisingly, § 1324a is underenforced. Between April 2018 and March 2019, the government prosecuted just seven § 1324a cases (charging a grand total of 11 people and no companies).[30] Nor is this anomalous. Since 1986, when Congress first criminalized employing undocumented workers, "[p]rosecutions have rarely climbed above 15 annually, and have never exceeded 20 individuals a year except for brief periods during 2005 under President Bush, and in the first year of the Obama Administration."[31]

~   ~   ~

In short, the purpose of criminalizing illegal reentry – and the continuing effect of our immigration laws – is not to deter unlawful entry into the United States. It is, instead, to preserve the steady influx of cheap, primarily Mexican labor, while simultaneously marginalizing those workers and excluding them from full participation in American life.

---

[29] *See* USCIS, I-9 Penalties, *available at* https://www.uscis.gov/i-9-central/legal-requirements-and-enforcement/penalties (last visited Aug. 12, 2020).

[30] *See* Michael J. O'Brien, *How Many Employers Have Been Prosecuted for Employing Illegals?*, Human Resource Executive (May 31, 2019), *available at* https://hrexecutive.com/how-many-employers-have-been-prosecuted-for-employing-illegals/ (last visited Aug. 12, 2020).

[31] Transactional Records Access Clearinghouse at Syracuse University, *Few Prosecuted for Illegal Employment of Immigrants*, *available at* https://trac.syr.edu/immigration/reports/559/ (last visited Aug. 12, 2020).

The illegal reentry statistics show that this crime has not yet been able to overcome its nativist origins. In FY2019, for example, the government prosecuted a total of 22,077 illegal reentry cases. A full 99% of the people convicted under § 1326 were of one race: Hispanic.[32] Nor is this just a product of the racial breakdown of unauthorized people in the United States; instead, "Latino and black immigrants are *disproportionately* represented among those being apprehended, detained, and deported from the country when compared with their share of the undocumented population[.]"[33] By contrast, of the tens of thousands of Canadians (est. 93,035 in FY2016) and Europeans (est. 123,729 in FY2016) who unlawfully overstayed their visas, the government has prosecuted exactly nobody.[34] Indeed, overstaying a visa – an offense overwhelmingly committed by Canadians and Europeans – is not even a crime.

---

[32] *See* U.S. Sent'g Comm'n, *Quick Facts: Illegal Reentry Offenses – Fiscal Year 2019*, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf (last visited Aug. 12, 2020).

[33] Elizabeth Aranda & Elizabeth Vaquera, *Racism, the Immigration Enforcement Regime, and the Implications for Racial Inequality in the Lives of Undocumented Young Adults*, I(I) Sociology of Race and Ethnicity 88, 98 (2015), *available at* https://projects.iq.harvard.edu/files/deib-explorer/files/aranda_and_vaquera.pdf (emphasis added).

[34] *See* Jeffrey S. Passel and D'Vera Cohn, *Homeland Security Produces First Estimate of Foreign Visitors to U.S. Who Overstay Deadline To Leave*, PEW RESEARCH CENTER, February 3, 2016, http://www.pewresearch.org/fact-tank/2016/02/03/homeland-securityproduces-first-estimate-of-foreign-visitors-to-u-s-who-overstay-deadline-to-leave/(last accessed March 8, 2019).

In light of the origins, purpose, and effect of the criminal immigration laws, imposing significant sentences on undocumented immigrants promotes neither respect for the law nor general deterrence.

## V

Mr. Miramontes has the great misfortune of being an undocumented American who – because he was living openly – could easily be found at a moment in American history when nativist sentiment is running particularly high, and when the Executive Branch has greatly expanded its approach to the criminal prosecution and exclusion of historically disfavored groups.[35] This is exactly the sort of person who – in friendlier times – would have benefited (indeed, appears to have been benefiting) from the humane exercise of prosecutorial and immigration-enforcement discretion. What's more, had the government but stayed its hand in the current prosecution and removal

---

[35] *See* U.S. Supreme Court, *2018 Year-End Report on the Federal Judiciary* (2018), *available at* https://www.supremecourt.gov/publicinfo/year-end/2018year-endreport.pdf ("Defendants charged with immigration offenses rose 37 percent, largely in response to a 40 percent increase in defendants charged with improper reentry by an alien."); U.S. Supreme Court, *2019 Year-End Report on the Federal Judiciary* (2019), *available at* https://www.supremecourt.gov/publicinfo/year-end/2019year-endreport.pdf ("Defendants charged with immigration offenses went up by 13 percent[.]"). There is little doubt that the racial and nativist origins of illegal reentry continue to play a disturbing role in immigration enforcement policy. *See Department of Homeland Security v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1917 (2020) (Sotomayor, J., concurring) (noting President Trump's description of specifically Mexican immigrants as "people that have lots of problems," "the bad ones," and "criminals, drug dealers [and] rapists"); *id.* (noting President Trump's comparison of undocumented Mexican immigrants to "animals"); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2436 (2017) (Sotomayor, J., & Ginsburg, J., dissenting) (cataloging Executive Branch expressions of antipathy toward another marginalized group: Muslims).

of Mr. Miramontes, it is imminently possible that he would eventually have been offered a way to stay here legally with his family. There was, at least, a chance of that.

As it is, however, the consequences of Mr. Miramontes's conviction and removal are likely to be dire and destructive. Mr. Miramontes's physician believes that "[l]eaving the United States would be detrimental to [Mr. Miramontes's] physical and emotional health," and the ethnographic literature confirms this. In *Deported Americans*, a recent ethnography on the consequences of removing undocumented people who have assimilated into American life, Professor Beth Caldwell describes the human effects of what Mr. Miramontes is about to undergo. According to Professor Caldwell, deported Americans experience intense "culture shock, " with one middle-aged deported American whom Professor Caldwell interviewed describing his experience very simply: "I feel like my whole world collapsed."[36] "Suicidal ideation was frequently reported by the [deported Americans] I interviewed, who often said they had 'lost everything' as a result of their removal from the United States."[37] Professor Caldwell also interviewed a Tijuana psychologist who works with deportees whose families remain in the United States. "'They feel completely lost in Mexico,' she says, 'and they become focused on how they can go back.' When they cannot return – or when they try and fail – people often spiral deeper into depression."[38]

---

[36] Beth C. Caldwell, *Deported Americans* 57, 60 (Duke University Press 2019).

[37] *Id.* at 68.

[38] *Id.* at 71.

As Mr. Miramontes tries to build a life for himself in Mexico, he is also going to have to deal with the slow degradation of his family ties. "When Gina was first deported," Professor Caldwell writes:

> she reported that her sons would clamor to get on the phone with her and would beg her to come back. Five years later she says, 'They don't even want to talk to me. It's like I'm a stranger to them. They don't even know me anymore.' She continues, 'They only get on the phone because my mom makes them. Can you imagine how that makes my heart break?'[39]

This problem goes in both directions. As Professor Caldwell summarizes, yet again, "[s]ocial science research has documented mental health issues among children who remain in the United States after a parent is deported, including heightened emotional and behavioral problems that are manifested in sleep problems, depression, anxiety, and poorer grades."[40] One study reports that children of deported parents "experience[] changes in their patterns of eating or sleeping" and that "[m]ore than a third" of them are "more anxious, withdrawn, clingy, angry, or aggressive" – with outcomes worsening as separation is prolonged.[41]

These are some of the troubling consequences of our government's on-again-off-again policy of "systematically and forcibly removing millions of Latino men from the boundaries of the country despite strong evidence of their attachments and claims

---

[39] *Id.* at 132.

[40] *Id.* at 134.

[41] *Id.* at 135.

to membership in American society."[42] Professor Joseph Carens succinctly summarizes the stakes of this decision:

> In fifteen years [less time than Mr. Miramontes has been here] connections grow: to spouses and partners, sons and daughters, friends and neighbors and fellow-workers, people we love and people we hate. Experiences accumulate: birthdays and braces, tones of voice and senses of humor, public parks and corner stores, the shape of the streets and the way the sun shines through the leaves, the smell of flowers and the sounds of local accents, the look of the stars and the taste of the air – all that gives life its purpose and texture. We sink deep roots over fifteen years, and these roots matter even if we were not authorized to plant ourselves in the first place.[43]

It is no wonder – in light of these stakes – that "[p]eople compare the experience of deportation to losing their limbs, to being raped, and to death."[44]

## VI

Under § 3553(a), the Court is to consider a number of factors in settling on the most parsimonious sentence sufficient to accomplish the goals of federal sentencing. The factors front-and-center in this case are the imposition of just punishment that promotes respect for the law. *See* 18 U.S.C. § 3553(a)(2)(A).

The nature and circumstances of this prosecution support Mr. Miramontes's requested sentence of 1-day to serve, a self-surrender deadline 1-month after he is able to obtain an FDA-approved Covid-19 vaccine, and a recommendation that the Executive Branch waive removal and permit him to remain in the United States. Mr.

---

[42] *Id.* at 189.

[43] Joseph Carens, "The Case for Amnesty," *Boston Review* (May/June 2009), *available at* http://bostonreview.net/forum/case-amnesty-joseph-carens.

[44] Cardwell, *supra* n.36 at 191.

Miramontes accomplished an unauthorized entry-after-removal into the United States some 20 years ago. Since then, he has been an asset to our country and to his local community. He has worked hard, raised a family, paid his taxes, pursued homeownership, given back to his neighbors, and laid down deep roots. Respect for the law requires honoring these contributions – and those roots.

Mr. Miramontes's arrest and prosecution contains troubling echoes of the nativist history of the illegal reentry crime. Unlike many other undocumented Americans – who are targeted by immigration enforcement after committing a state misdemeanor or felony offense – Mr. Miramontes committed no contemporaneous crime to put himself on immigration enforcement's radar. Instead, ICE targeted him for mere unauthorized presence; immigration enforcement was surveilling him because he had been living openly in the U.S., and they knew he was undocumented. Mr. Miramontes's arrest and prosecution, at this moment in time, appears to have flowed from the shifting winds of immigration enforcement, not from anything Mr. Miramontes specifically did to warrant the exercise of immigration-enforcement discretion. Immigration enforcement has increased massively over the past 2 years, overwhelmingly targeting Latinos – often in degrading and dehumanizing ways.[45] The historical and contemporary context underlying the current, system-wide

---

[45] *See* U.S. Sent'g Comm'n, *supra* n.32; *see also* Michael Garcia Bochenek, Human Rights Watch, *US: Family Separation Harming Children, Families* (July 11, 2019), *available at* https://www.hrw.org/news/2019/07/11/us-family-separation-harming-children-families (describing U.S. policy of separating migrant children from their families at the southern border, with the result that "children as young as 5 have been held in Border Patrol holding facilities without their adult caretakers").

decision to target unauthorized Americans for prosecution and removal needs to be acknowledged in crafting a disposition in this case.

The sentence we propose promotes respect for the law by acknowledging the historical and legal context underlying Mr. Miramontes's prosecution and removal, the enormity of what is about to befall him and his family, his singular good character, and his accomplishments and contributions to the United States. Merely branding Mr. Miramontes a felon and sending him on his way to Mexico, wishing him good luck, and reminding him not to come back, offends our intuitive sense of justice. More must be done and more must be said.

In particular, we ask the Court to give Mr. Miramontes until one month after he receives a Covid-19 vaccine to self-surrender. This disposition recognizes that if he's to be deported, with all of its attendant ills, he at least deserves as much of a chance as we can give him of a healthy life in Mexico.[46] His physician describes his physical condition: Mr. Miramontes suffers from hypertension and hyperlipidemia, which his physician believes is a result of an "increased stress response" flowing from

---

[46] As the Court may know, immigration detention facilities are rife with Covid-19. *See generally* Center for Migration Studies, *Immigrant Detention and COVID-19: How a Pandemic Exploited and Spread through the U.S. Immigrant Detention System* at 2-4 (August 2020), *available at* https://cmsny.org/wp-content/uploads/2020/08/CMS-Detention-COVID-Report-08-12-2020.pdf (documenting alarming and continuing spread of Covid-19 within ICE detention facilities and noting that "[a] simulation by the Vera Institute for Justice . . . estimated that 19 percent of all detainees over a 60-day period between mid-March and mid-May 2020 would have contracted COVID-19"). Mr. Miramontes is at heightened risk from the virus because of his age and hypertension, so it is important to protect him.

his arrest in 2019. Particularly in light of his medical risk factors – a direct result of his arrest and prosecution – giving Mr. Miramontes the opportunity to protect himself from Covid-19 does justice and will promote respect for our legal system.

The same holds of our request for a recommendation that the Executive Branch waive removal and let Mr. Miramontes remain in the country.[47] If anyone has redeemed themselves for the act of coming back into the United States following deportation, it is Mr. Miramontes. As his colleagues, family, and community all attest, he is a tremendous asset to Caldwell and the United States. His presence makes America stronger and greater than it otherwise would be. He's earned a recommendation from this Court, and, even if this recommendation is not ultimately followed, our legal system will be more respectable for the Court's having at least recognized the basic moral fact that this man should not be removed from his family and his home – and urged its realization.

## VII

On July 31, 2017, Judge Susan R. Bolton found former Maricopa County Sheriff Joseph M. Arpaio guilty of criminal contempt of court. *See United States v. Arpaio*, 2017 WL 3268180 (D. Ariz. July 31, 2017). Sheriff Arpaio's crime involved what the federal district court in Arizona described as "particularly egregious and

---

[47] This Court has the power to make such a recommendation. *See, e.g.*, *United States v. McDade*, 639 F. Supp. 2d 77, 86-87 (D.D.C. 2009) ("[T]he Court urges the President to consider executive clemency for Mr. McDade[.]"); *see also United States v. Angelos*, 345 F. Supp. 2d 1227, 1261 (D. Utah 2004) (finding recommendation of clemency "is entirely proper" for a court to make).

extraordinary facts" – repeated flouting of court orders requiring him to stop unlawfully profiling and detaining Latinos in connection with *ultra vires* enforcement of immigration laws. *Melendres v. Arpaio*, Case No. 2:07-cv-2513, Dkt. No. 1748 (D. Ariz. July 20, 2016). Sheriff Arpaio "used race" in effecting these illegal stops, and "[a]s a result," his officers "stopped [Latinos] who were authorized residents of the United States that [they] would not have otherwise had grounds to stop if [they had] complied with the preliminary injunction." *Melendres v. Arpaio*, Case No. 2:07-cv-2513, Dkt. No. 1677, at 33 (D. Ariz. Sept. 2016).

The National Association for the Advancement of Colored People has described Sheriff Arpaio's modus operandi as follows:

> Entrusted with the safety and well-being of the over four million residents of Maricopa County, Arpaio instead turned the county into a breeding ground of humiliation, intimidation and racial profiling. And his jails became inhumane facilities operating under a culture of cruelty. Communities were terrified by his illegal and mismanaged immigration enforcement, inmates died in his jails, and he used his leverage as a "law and order" proponent to become a heavy hitter in federal politics and raise vast sums for his reelection campaigns.[48]

Sheriff Arpaio openly flouted numerous injunctions ordering him to stop racially profiling and terrorizing Latino residents of Maricopa County, he ignored a civil contempt order, and he was finally prosecuted for criminal contempt of court. On

---

[48] *See* NAACP, *Condemning Sheriff Joe Arpaio Pardon: Joint Statement From Leading Civil Rights and Racial Justice Organizations* (Aug. 23, 2017), *available at* https://www.naacp.org/latest/condemning-sheriff-joe-arpaio-pardon-joint-statement-leading-civil-rights-racial-justice-organizations/.

August 25, 2017, less than a month after his conviction, the Executive Branch pardoned Sheriff Arpaio.[49]

If Sheriff Arpaio deserves mercy, then so too does Sergio Miramontes-Maldonado. It is difficult to imagine Mr. Miramontes pursuing a campaign of humiliation, intimidation, or racial profiling. This is a man whose first instinct is to uplift his neighbor, not to degrade them. Recall his son-in-law's letter and the other outpourings of support from his community. Even when they are down, he doesn't make his neighbors or his family feel small. He gives selflessly to them and doesn't hold it over their heads.

Just as it did with Sheriff Arpaio, the Executive Branch should find a way to exercise mercy for Sergio Miramontes-Maldonado. To the extent it can do so, this Cout should extend mercy to Mr. Miramontes in this case, and it should recommend that the Executive Branch do the same.


Dated: August 18, 2020              Respectfully submitted,
                                    SAMUEL RICHARD RUBIN
                                    FEDERAL PUBLIC DEFENDER
                                    By:

                                    /s/ Miles Pope
                                    Miles Pope
                                    Assistant Federal Defender
                                    Federal Defender Services of Idaho
                                    Attorneys for Sergio Miramontes-Maldonado

---

[49] *See* The White House, *President Trump Pardons Sheriff Joe Arpaio* (Aug. 25, 2017), *available at* https://www.whitehouse.gov/briefings-statements/president-trump-pardons-sheriff-joe-arpaio/.

Sentencing Memorandum              -24-

CERTIFICATE OF SERVICE

I CERTIFY that I am an employee of the Federal Defender Services of Idaho, and that a copy of the foregoing document was served on all parties named below on this 18th day of August 2020.

| Kate Horwitz, Assistant U.S. Attorney | \_\_\_\_ Hand Delivery |
|---|---|
| Office of the United States Attorney | \_\_\_\_ United States Mail |
| Washington Group Plaza, IV | X CM/ECF Filing |
| 800 Park Blvd, Suite 600 | \_\_\_\_ Email Transmission |
| Boise, ID 83712 | |
| Kate.Horwitz@usdoj.gov | |

Dated: August 18, 2020       /s/ Joy Fish
                             Joy Fish